## MARCHANT et al. v. NATIONAL RESERVE CO. OF AMERICA, et al.

No. 6494.  Decided May 12, 1943.  (137 P. 2d 331.)

532

Rehearing denied July 23, 1943.

*E. A. Walton* and *R. Leslie Hedrick,* of Salt Lake City, for plaintiffs and appellants.

*Ingebretsen, Ray, Rawlins & Christensen, Brigham E. Roberts, Wood R. Worsley,* and *Irvine, Skeen & Thurman,* all of Salt Lake City, for defendants and respondents.

*Grant Macfarlane,* of Salt Lake City, for cross-complainant and appellant.

LARSON, Justice.

This action was brought by plaintiffs as stockholders of defendant, National Reserve Company of America, a corporation, hereinafter called the Reserve Company, against the company itself, J. A. Malia, its receiver, the officers of the company, and Thomas McJilton, as defendants. The receiver, by cross-complaint, and certain officers of the company, by statements into the record at the beginning of the trial became virtually co-plaintiffs. Basically their interest in the action is the same as the parties captioned as plaintiffs. The real situation is that the Reserve Company, as a stockholder in the National Building and Loan Association, a Nevada corporation, hereinafter called the Nevada Company, was suing defendant McJilton, seeking to recover certain property, or the value thereof, which McJilton had acquired in a purchase of the assets of the Nevada Company, at a receiver's sale. Judgment for defendant McJilton; the plaintiffs and cross-complainant, Malia, appeal.

The Reserve Company was organized in July, 1930, as a holding company for the purpose of holding and exercising operative control of several subsidiary building and loan associations, including the Nevada Company; the National Building and Loan Association of Utah, hereinafter called the Utah Company; and the National Building and Loan Association of New Mexico, hereinafter called the New Mexico Company. The common stock of these subsidiaries has been at all times owned or controlled by the Reserve Company. In September, 1933, the Utah State Bank Commissioner took over the Utah Company as insolvent, and in the District Court of Salt Lake County, became its receiver. In April, 1937, D. G. LaRue, Bank Commissioner of Nevada, in the Nevada courts, took over the Nevada Company, as receiver for liquidation, because the company was too small to obtain Federal insurance, and could not operate safely. In July of that year as receiver, he sold some of the assets of the Nevada Company to defendant,

McJilton, which sale was confirmed by the Nevada court, and the company's business wound up. In May, 1937, receivership proceedings against the Reserve Company were commenced in the Utah courts, and defendant and cross-complainant, J. A. Malia, was appointed receiver. Liquidation proceedings of the Reserve Company were pending in court at the time of the trial of this action.

After La Rue, Nevada Banking Commissioner, took over the Nevada Company in April, 1937, he filed with the court an inventory of its assets and liabilities (copy of which was received in evidence in this case) and offered all the assets of the company for sale. The bid of defendant McJilton was accepted by the receiver and all the assets of the company, except real estate in New Mexico and cash in the bank were sold to him, subject to approval of the court. The assets of the Nevada Company sold by the receiver to McJilton were appraised by the receiver at $25,318.83. The sale price was $26,156.94, or $838.11 above the receiver's appraisal. Included in these assets were two notes of the Reserve Company for $12,061.91, and $8000.00, secured by certificates in the Utah Company of a book value of $41,562.68, and appraised by the receiver at $5,500.00. At 11c appraisal the certificates would value $4,571.89; at the 40c value claimed by appellants they would value $16,624.80. The two notes totalled $20,061.91, plus interest, or a deficit according to the receiver's appraisal of $15,490.02, plus interest; and according to the value claimed by plaintiffs, a deficit of $3,437.11, plus interest. It is conceded by plaintiffs that the security did not exceed in value the amount of the notes, and no point is raised as to this item.

There was a third note of the Reserve Company for $3,129.93, secured by certificates of the Nevada Company, valued by the receiver at par. The security actually realized the sum of $1,589.74 in excess of the note, which McJilton credited on other notes of the Reserve Company. We will refer again to this note later.

There was also a note for $12,900.00 signed by E. S. Walker, which note was given without consideration, for inter-office purposes, to account for such sum of money of the company sent to Salt Lake City to be used by Walker in purchasing for the Nevada Company certificates in the Utah Company. When the Nevada Company received the certificates in the Utah Company, the note became a nullity. Two factions, known as the "Diblee" and the "Layton" groups, were seeking control of the Utah Company, in a battle over reorganization. The Diblee group, who controlled the Reserve Company, and through it all the subsidiary companies, apparently operated through the Nevada Company to gain this control. A contract was finally entered into whereby the "Layton" group agreed to sell its holdings in the Utah Company, for an agreed cash price of about 32c on the dollar, and one-half of the receivership dividends, accruing on their block of certificates. The cash was paid, and the contract assigned by the Layton group to one Jenkins, who comes into the story later. Through the activities of Walker and one Rich, there was purchased from the Layton group and others, $55,944.19 book value of certificates in the Utah Company for about $18,000.00. To raise this money, the Nevada Company furnished the $12,900.00 represented in its inter-office practice by the Walker note, and the Reserve Company borrowed and advanced the balance, $5,200.00, pledging all the stock purchased to the bank for the $5,200.00 loan, which note and security finally came into the hands of Dr. E. A. Tripp, and will hereafter be referred to as the Tripp note. In making the $5,200.00 loan the Reserve Company, by resolution of its Board of Directors, disavowed any ownership or interest in the certificates, except as security for the money borrowed and advanced by it. Therefore, when the note held by Dr. Tripp was paid off by or for the Nevada Company, the Reserve Company had no interest in the stock, which was then the property of the Nevada Company. At the sale of the Nevada Company assets to McJilton, the receiver

appraised these certitficates in the Utah Company at 11c on the dollar, or $6,153.84, against which was the Tripp note, amounting, with interest, to $5,488.78, which McJilton paid off. According to the receiver's appraisal at the sale these certificates represented an equity in the Nevada Company of $665.06.

After the Nevada sale, Jenkins, as assignee of the Layton contract, filed suit in the Utah courts against McJilton, the Utah Company, J. A. Malia, as receiver of the Reserve Company, and Walker, claiming title to one-half of the $55,944.19 parcel of shares. McJilton in a cross-complaint, set up title in himself, Malia, with approval of the court in which the Reserve Company receivership proceedings were pending, in behalf of the Reserve Company waived all claims to, and disclaimed any interest in this parcel of stock. The suit was compromised with the approval of the court, giving Jenkins $9,300.00 book value shares, and title to the remaining shares was quieted in McJilton. Liquidating the properties and choses in action acquired by him at the Nevada sale in 1937 to time of trial of this action, McJilton realized $65,290.29, gross, or $28,641.17 over the price he paid. Against this, he claimed reimburseable expenditures in liquidating of $36,649.12 or a loss to him of $7,809.95.

Plaintiffs instituted this action against McJilton to set aside the Nevada sale for actual and constructive fraud, inadequacy of consideration and unconscionability, and in effect, to recover from McJilton the difference between what he paid for certain of the assets, and what he realized from them. Plaintiffs are not stockholders in the Nevada Company, but are stockholders in the Reserve Company, which was a stockholder in the Nevada Company, and make this suit in equity to enjoin McJilton from enjoying the benefits of his purchase, and to quiet title of the Reserve Company in certain stock in the Utah Company, and proceeds thereof, which stock McJilton received at the Nevada sale. Plaintiffs contend that the assets of the Nevada Com-

pany were sold at an unconscionably low price, were in effect scuttled by collusion between McJilton, the officers of the company, and LaRue, the receiver, thereby perpetrating a fraud upon the stockholders of the Nevada Company, of which the Reserve Company was one. Plaintiffs are interested as stockholders in the Reserve Company, part of whose assets they claim were lost in the Nevada deal. As a basis for their suit they contend: (a) That there was a collusion between McJilton and some of the officers of the Reserve Company and the Nevada Company to sell the assets low, to scuttle them to McJilton; (b) that the sale price of the assets was so low as to be unconscionable and a constructive fraud; (c) that to perpetrate the fraud upon the stockholders they perpetrated a fraud upon the Nevada Court which confirmed the sale.

The assignment of nineteen errors relied upon for reversal are directed at the trial court's findings of fact on the following matters:

(1) As to whether the Reserve Company or the Nevada Company was the owner of the $55,944.19 book value block of certificates, at the time of the sale of the Nevada Company's assets to McJilton.

(2) As to the validity of the judgment and decree in the Jenkins suit.

(3) As to whether the sale in Nevada was procured by fraud and misrepresentation.

(4) As to whether the price at which McJilton bought was so unconscionably low as to amount to a fraud on the stockholders of the Reserve Company. We consider them in order.

(1) The trial court found the $55,944.19 book value block of certificates in the Utah Company were the property of the Nevada Company at the time of the sale to McJilton. Plaintiffs contend this was error, and the court should have found that these certificates were the property of the Reserve Company, subject only to the lien for the payment of the Tripp note. The evidence shows that this stock was

acquired in September and October, 1936, through the activitites of Walker, in a struggle for control in a battle involving reorganization of the Utah Company, which was and had been in receivership as insolvent since September, 1933. Diblee and others proposed a reorganization wherein the certificates would be assumed by the reorganized company at forty cents on the dollar. The Layton group were opposing this reorganization, with a plan of theirs whereby their faction would be in control, and the certificates taken over at 50c on the dollar, and the battle for control resulted. Layton was having difficulty in arranging the financing of his plan, and a number of the holders of the stock he represented became dissatisfied. The Nevada Company held some 51¼ shares saving stock in the Utah Company, as security for a note of the Reserve Company in the sum of $3128.93, and interest. Interested in preserving this holding, among other things, the Nevada Company, through Walker, its vice-president, had been working on the Layton group, and finally bought their block of certificates, Layton retaining an option to repurchase until October 30, at 50c on the dollar, book value. The Nevada Company sent Walker $12,900.00 for this purchase. He secured $42,174.01 book value of certificates for them for $12,652.20. This not being enough for control, Walker borrowed some $5,-200.00 from the First Security Bank at Salt Lake and pledged the certificates received from Layton to secure the loan. From this loan, additional certificates of the book value of $13,770.18 were secured, making the total block of $55,944.19 here involved. The Nevada Company sent the $12,900.00 to Walker pursuant to a resolution of its Board of Directors, which resolution, after referring to the company's interest in the Utah Company's assets, which interest they deemed was being adversely affected by the struggle over and delay in the reorganization of the Utah Company, reads:

"Now Therefore Be It Resolved that E. S. Walker, vice-president of this corporation, now in Salt Lake City, Utah, be and he is hereby

authorized and directed to acquire said certificates at an advancement of not to exceed twenty-eight cents on the dollar of surrender value with the stipulation that the owner and pledger * * * is to participate equally with this corporation in the cash or stock benefits resulting out of this transaction over and above the sum involved * * * in taking over the said certificates.

"Be It Further Resolved that the corporation's funds be transmitted to Salt Lake City in such manner and form as will in the opinion of the management best expedite the consummation of this proposed action. * * *"

On October 21, Walker wrote the Nevada Company that he had acquired for it, certificates in the Utah Company of a book value of $55,944.19, subject to Layton's option to repurchase; which if Layton exercised, would give the company a good profit; otherwise, the Nevada Company with these certificates and its control of the $41,652.68 parcel it held in pledge, would be in virtual control of the Utah Company. When Layton failed to exercise his option, it was thought advisable to get the $55,000 block of certificates Walker had pledged, out of the hands of the First Security Bank, which had been Layton's sponsor. Accordingly, through the Reserve Company, which had its office in San Francisco, a loan was arranged from the Pacific National Bank, to pay off the First Security Bank. The Reserve Company signed the note to the Pacific National Bank, and the certificates were pledged to secure this loan. The Directors of the Reserve Company, by resolution, after reciting these facts, said:

"Now Therefore, Be It Resolved, that this corporation accept *temporary* title to the said securities and pledge them on this corporation's note with the Pacific National Bank for such sum or sums as are now necessary, and in the furtherance of this transaction become necessary, and that this corporation hereby execute this assignment of all its right, title and interest in and to the said certificates save and except that portion necessary to cover the sum involved in said transfer and the expenses incident to the consummation of the transaction. That is to say, that in consideration of this corporation's service and the obligations assumed by it, the assets handled be liable for the expense, but beyond that expense, this corporation claims no

title or interest in the said certificates, or other assets involved in the transaction." (Italics added.)

Taken together, these exhibits make it clear that it was the intention of the Nevada Company to acquire title, and that it advanced the money for this purpose. The Reserve Company recognized that title, and disclaimed any interest in that stock, except to the extent of the loan made on its credit for the portion of the purchase price of that stock. There can be no doubt then, that if there were no other consideration, title to this stock would be in the Nevada corporation. As to the matter of the Reserve Company's note, that was later assigned to Dr. Tripp, and McJilton has paid this note, so there is no cloud on the title from that transaction.

However, plaintiffs maintain that the Nevada Company, a foreign corporation, was doing business within the state of Utah, without having qualified to do business, and therefore by the provisions of the Utah Statutes was disqualified from taking title to the stock.

Section 18-8-5, Utah Code Ann., 1943, dealing with the disabilities of non-complying foreign corporations, reads in part as follows:

"Any foreign corporation doing business within this state and failing to comply with the provisions of sections 18-8-1 and 18-8-2 shall not be entitled to the benefit of the laws of this state relating to corporations * * * or of any contract, agreement or transaction made or entered into, in this state by such corporation, or by its assignors or by any person from, through or under whom it derives its interest or title or any part thereof, and shall not take, acquire or hold title, possession or ownership of property, real, personal or mixed, within this state; and every contract, agreement and transaction whatsoever made or entered into by or on behalf of any such corporation within this state * * * shall be wholly void on behalf of such corporation and its assignees and every person deriving any interest or title therefrom * * *."

Sections 18-8-1 and 18-8-2, referred to above, set out the requirements to be met by a foreign corporation before it is qualified to do business within the state, and admittedly

the Nevada Company had not met with these requirements, so it merely remains to determine what constitutes doing of business within the state of Utah, and whether the transactions of the Nevada Company are within the scope of the term.

Art. 12, § 9, Utah State Constitution, provides as follows:

"No corporation shall do business in this State, without having one or more places of business, with an authorized agent or agents, upon whom process may be served; nor without first filing a certified copy of its articles of incorporation with the Secretary of State."

An early Utah case discussing what constituted "doing business" within a state is *Barse Live-Stock Comm. Co.* v. *Range Valley Cattle Co.*, 16 Utah 59, 50 P. 630, 632, wherein the court said, in discussing both the statute and the constitutional provision:

" 'To do business,' as defined by Webster, is 'to carry on any particular occupation or employment for a livelihood or gain, as agriculture, trade, mechanic arts, or profession; that which busies or occupies the time, attention, or labor of one.' The statute applies to foreign corporations. The constitution applies to all corporations. In our opinion, the constitution, when reasonably construed, was intended to prohibit corporations from transacting their ordinary corporate business within the state without first complying with its terms, and having one or more places of business, with an authorized resident agent upon whom process could be served in cases of litigation between them and citizens of the state, and to protect citizens of the state against fraud and imposition by insolvent and unreliable corporations, and place them in a position to be reached by the legal process of the courts of the state, and *was not designed or intended to prohibit the doing of one single act of business by such corporation with no apparent intention to do any other act, or to engage in corporate business.*" (Italics in original.)

Quoting from *Cooper Manufacturing Co.* v. *Ferguson*, 113 U. S. 727, 734, 5 S. Ct. 739, 741, 28 L. Ed. 1137, the court goes on:

" 'The constitution requires the foreign corporation to have one or more known places of business in the state, before doing any business therein. This implies a purpose at least, to do more than one act of

business; for a corporation that has done but a single act of business, and purposes to do no more, cannot have one or more known places of business, to have known places of business, it must be carrying on, or intending to carry on business.'"

The court further quotes from Thompson on the Law of Corporations, § 7963:

" 'The general conclusion of the courts is that isolated transactions, commercial or otherwise, taking place between a foreign corporation domiciled in one state and citizens of another state, are not a doing or carrying on of business by the foreign corporation within the latter state, but that these prohibitions are leveled against the act of foreign corporations entering the domestic state by their agents, and engaging in the general prosecution of their ordinary business therein.'" Citing *Commercial Bank* v. *Sherman*, 28 Or. 573, 43 P. 658, 52 Am. St. Rep. 811; *Gilchrist* v. *Helena, H. S. & S. Railroad Co.*, C. C., 47 F. 593; *Colorado Iron-Works* v. *Sierra Grande Min. Co.*, 15 Colo. 499, 25 P. 325, 22 Am. St. Rep. 433; *Utley* v. *Mining Co.*, 4 Colo. 369; *Scruggs* v. *Mortgage Co.*, 54 Ark. 566, 16 S. W. 563.

In a later case, *Booth & Co.* v. *Wiegand*, 30 Utah 135, 83 P. 734, 737, 10 L. R. A., N. S., 693, discussing the above statutory and constitutional provisions, the court said:

"The words 'doing business,' as used in these provisions, refer to a general transaction of business, and not to an isolated transaction, or to single, or wholly collateral acts. The statute obviously relates to some regular or customary business." Citing *Barse Live-Stock Comm. Co.* v. *Range Valley Cattle Co.*, supra; *Florsheim Bros. Dry Goods Co.* v. *Lester*, 60 Ark. 120, 29 S. W. 34, 27 L. R. A. 505, 46 Am. St. Rep. 162; *Gilchrist* v. *Helena, H. S. & S. R. Co.*, C. C., 47 F. 593.

The court then goes on to decide that the taking of assignments by the foreign corporation and bringing suit thereon, not being within the regular course of the business, and being an isolated transaction, is not "doing business" within the meaning of the statutory and constitutional provisions. The opinion in this case and the *Barse Live-Stock Comm. Co.* v. *Range Valley Cattle Co.* case, supra, were cited, approved and followed in *Home Brewing Co.* v. *American Chemical & Ozokerite Co.*, 58 Utah 219, 198 P. 170.

A recent Utah case on this subject is *Kansas City Whole-sale Groc. Co.* v. *Weber Packing Corp.*, 93 Utah 414, 73 P. 2d 1272, where the court held that a foreign corporation having no agents within the state of Utah, was not engaged in business within the state when it made a contract for the purchase of goods with a Utah company, the contract having been made in a foreign state, and the goods to be shipped to that state. See, also, *American Invest. Corp.* v. *State Tax Comm.*, 101 Utah 189, 120 P. 2d 331.

In *Metal Door Co.* v. *Hunt*, 170 Okl. 240, 39 P. 2d 72, 75, 101 A. L. R. 350, the court defines "doing business," as follows:

"In the case of *Fuller* v. *Allen*, supra [46 Okl. 417, 148 P. 1008], this court said with reference to the meaning of the statute: 'The question now presented is, What is meant by transacting business? The best definition we can think of for this phrase is the doing or performing a series of acts which occupy the time, attention, and labor of men for the purpose of livelihood, profit, or pleasure. It is well settled upon authority that the doing of a single act pertaining to a particular business or transaction will not be considered carrying on, transacting, or doing business. The mere term itself implies more than one transaction.' "

Quoting from *Chicago Crayon Co.* v. *Rogers*, 30 Okl. 299, 119 P. 630, the court goes on:

"It is settled that a single or isolated transaction of a corporation will not be void because of the failure by the corporation to designate an agent in the state."

and it of course follows from that statement that a "single or isolated transaction" cannot be considered doing business in the state within the terms of the statutory provisions.

This question of when a corporation is doing business within a state also arises in connection with statutory provisions requiring foreign corporations to designate an agent for service, and providing in case of their failure to do so that service may be upon some public officer. The

California court in *West Pub. Co.* v. *Superior Court*, 20 Cal. 2d 720, 128 P. 2d 777, 780, reviewed the authorities on this question as follows:

"In *Tauza* v. *Susquehanna Coal Co.*, 220 N. Y. 259, 115 N. E. 915, 917, 918, the late Judge Cardozo commented upon the criterion of corporate presence in this connection as follows: 'If in fact it (the corporation) is here, if it is here, not occasionally or casually, but with a fair measure of permanence and continuity, then, whether its business is interstate or local, it is within the jurisdiction of our courts * * *. But there is no precise test of the nature or extent of the business that must be done. All that is requisite is that enough be done to say that the corporation is here.' As was said in *International Harvester Co.* v. *Kentucky*, supra [234 U. S. 579, 34 S. Ct. 944, 58 L. Ed. 1479], each case must depend upon its own facts.

"While it is clear from these general observations that the application of a practical test is necessary to determine the validity of the service of jurisdictional process upon a foreign corporation, certain fundamentals have been settled establishing that neither isolated business transactions (*Hunter* v. *Mutual Res. Life Ins. Co.*, 218 U. S. 573, 31 S. Ct. 127, 54 L. Ed. 1155, 30 L. R. A., N. S., 686), nor the mere solicitation of business (*Green* v. *Chicago Burl. & Q. Ry. Co.*, 205 U. S. 530, 27 S. Ct. 595, 51 L. Ed. 916) nor holding stock in subsidiary corporations (*Peterson* v. *Chicago, R. I. & P. Ry.*, 205 U. S. 364, 27 S. Ct. 513, 51 L. Ed. 841; *People's Tobacco Co.* v. *American Tobacco Co.*, 246 U. S. 79, 38 S. Ct. 233, 62 L. Ed. 587, Ann. Cas. 1918C, 537), even to the point of complete control (*Cannon Mfg. Co.* v. *Cudahy Packing Co.*, 267 U. S. 333, 45 S. Ct. 250, 69 L. Ed. 634), nor advertising or demonstrating products (*Harrell* v. *Peters Cartridge Co.*, 36 Okl. 684, 129 P. 872, 44 L. R. A., N. S., 1094), nor its listing in the telephone directory or having its name on the door of an office (*Philadelphia & Reading R. Co.* v. *McKibbin*, 243 U. S. 264, 37 S. Ct. 280, 61 L. Ed. 710), nor the presence of a corporation official on personal business (*Riverside & Dan River Cotton Mills* v. *Menefee*, 237 U. S. 189, 35 S. Ct. 579, 59 L. Ed. 910) will amount to the presence of the corporation. It is thus apparent that it is not *any* activity of a corporation in a state other than its residence which will justify the conclusion that it is 'doing business' there * * * but it is the combination of local activities conducted by such foreign corporation —their manner, extent and character—which becomes determinative of the jurisdictional question."

The Montana Supreme Court in *State* v. *Second Judicial District Court*, 98 Mont. 278, 41 P. 2d 26, 29, in discussing

this same question of when a corporation is engaging in business within the meaning of statutes regarding the service of summons, states:

"Isolated transactions do not constitute a doing of business within the meaning of the statute; it contemplates a more or less continuing course of business. *General F. E. Co.* v. *Northwest A. S. Co.*, 65 Mont. 371, 211 P. 308, 310; *Pittsburg & Shawmut Coal Co.* v. *State*, 118 Misc. 50, 192 N. Y. S. 310; *Home Lumber Co.* v. *Hopkins*, 107 Kan. 153, 190 P. 601, 10 A. L. R. 879; *Walton N. Moore Dry Goods Co.* v. *Commercial I. Co.*, D. C., 276 F. 590.

"A foreign corporation which makes merely a single sale of its product in the state does not transact business in the state within the meaning of the foregoing corporation statute. *Vermont Farm Mach. Co.* v. *Ash*, 23 N. M. 647, 170 P. 741; *Denison* v. *Phipps*, 87 Okl. 299, 211 P. 83."

In *Holloway Material & Supply Co.* v. *Perfection Oak Flooring Co., Okl. Sup.*, 130 P. 2d 296, there was a transaction clearly in interstate commerce, which by the established rule takes the corporation outside of the regulation of the state, and obviates the necessity for that corporation to become domesticated before transacting the business. In that case, however, the goods sold were temporarily stored in the state, and there were certain negotiations within the state after the goods had arrived. The Oklahoma court held that this would not remove the transaction from the category of interstate commerce and constitute "doing business" within the state.

In *American Fire Prevention Bureau* v. *Automatic S. Co.*, D. C., 42 F. Supp. 220, 224, the court was again considering what would constitute "doing business" sufficient to subject the corporation to the jurisdiction of the courts of the state. It said:

"To subject a foreign corporation to legal process, it must be conducting business within the state with some degree of permanence and continuity. *Goldey* v. *Morning News*, 156 U. S. 518, 15 S. Ct. 559, 39 L. Ed. 517; *Riverside & Dan River Cotton Mills* v. *Menefee*, 237 U. S. 189, 35 S. Ct. 579, 59 L. Ed. 910; *Rosenberg Bros. & Co.* v. *Curtis Brown Co.*, 260 U. S. 516, 43 S. Ct. 170, 67 L. Ed. 372; *Tauza* v. *Susquehanna Coal Co.*, 220 N. Y. 259 [115 N. E. 915]."

The court then goes on to decide that doing business through a subsidiary corporation, even though that subsidiary is entirely controlled by the foreign corporation, is not "doing business" within the meaning of the statute regarding service of process on foreign corporations.

To summarize, then, the law may be stated to be, from the foregoing decisions, that to be "doing business" in a state, a corporation must be engaged in a continuing course of business, rather than a few isolated transactions, whether those transactions are within the usual scope of that corporation's business or not. There must be at least some permanence about the presence and business transactions of the corporation within the state.

From the record in the instant case, it appears that prior to 1933, the Nevada corporation was in fact present in Utah, and had its principal offices in Salt Lake Cty. In that year, however, the offices were moved to Reno, so that nothing can be claimed on that account, since the withdrawal from the state preceded the sale here in question by about two years. Evidence introduced by plaintiffs for the purpose of showing the presence of the Nevada Company in the state of Utah consists of four deeds, recorded in Salt Lake County. The first deed, dated July 1, 1933, is from the Utah Company to the Nevada Company of land in Utah. There were three other deeds all under date of June 30, 1935, about two years before the sale in question, from the Nevada Company to the Reserve Company. This, then is the extent of the evidence.

It does not appear to the court that a showing of four deeds having been made during the course of four years is sufficient evidence of corporate activity within the state to constitute "doing business" within the state of Utah under the above cited authorities. Accordingly we hold that the Nevada Company was not disabled from taking title to the Utah stock; that it had not been doing business within the state in violation of § 18-8-5, Utah Code Ann., 1943, and that therefore title did pass to that

company by virtue of the fact that purchase money for the stock was supplied by the Nevada Company. In addition to the finding of fact made by the lower court, it should have made a specific finding of title in the Nevada Company to the $55,944.19 block of certificates.

(2) Plaintiffs assail the findings to the effect that the judgment and decree in the Jenkins suit were valid. The only point in this matter rests upon the claim that the Reserve Company, and not the Nevada Company was the owner of the $55,944.19 block of certificates. Since we have already held they were the property of the Nevada Company, and the Reserve Company had no interest therein except to protect the Tripp note, which McJilton had paid off, it must follow that this point has no standing, because its foundation has vanished. But even if we had not so held, plaintiff has shown no injury or damage. If the Nevada Company had not owned the certificates, they would have been pledgees of them, to secure the Tripp note, $5,200.00, with interest, paid off at $5,488.78, the Walker note for $12,900.00, with interest from November, 1936, to the time of the Jenkins trial, June, 1938, amounting to $13,992.00. By the contract with Layton, Jenkins, as his assignee, was entitled to half of the accruing receiver's dividends on the stock, which McJilton settled with Jenkins for $3,750.00 counting the stock at forty cents on the dollar. These items total $23,230.78 against the certificates which plaintiffs value at $22,377.60, computed at forty cents on the dollar.

(3) Was the sale of the Nevada assets to McJilton procured by fraud and misrepresentation practiced upon the Nevada Court? Plaintiffs contend there was actual fraud: first, because the petition for sale of the assets was lacking in one particular; second, because of Walker's connection with the McJilton bid. They contend there was constructive fraud because the price was grossly inadequate.

Among the assets of the Nevada Company was a note signed by the Reserve Company for $3,128.93, secured by

stock in the Nevada Company. The note was listed in the appraisers inventory, which was part of the receiver's petition for sale, as:

"Certificate Loans                                                    $3,128.93
  "Note of National Reserve Company to National Building
and Loan Association, date, April 20, 1935, with interest at
6% from date. Secured by 51¼ shares Savings Stock and
optional certificates No. 3, 9, 14, 24, 16, 2, having total book
value of $229.07"

It is argued that a fraud was practiced on the court because neither the inventory nor the petition for sale recited that the security was worth $1,589.74 more than the note it secured. True in the final liquidation, this stock paid out that amount more than the note it secured, but its value at the time of sale depended upon what could be received from a sale of the assets. Furthermore, the note which was before the court, recited that any excess in security was to be applied on the other notes of the Reserve Company held by the Nevada Company. The surplus was so applied by McJilton, and still left a deficit on the Reserve Company notes. If the value of this security had been estimated and set out at its face value (which at that time there was no assurance it would bring) it could not have enlightened the court more, nor had any effect upon the sale. The records certainly showed the assets of the company and it liabilities, and would indicate as well as a statement by the receiver what the possible value of the security was. Such omission does not amount to a fraud or deception, especially where there is no evidence or reason to believe it was omitted to deceive or mislead.

We come now to the question as to whether the actions of Walker in his contacts with McJilton before the sale were such a violation of duty toward the company of which he was an officer as to make the purchase by McJilton a fraud on the stockholders of the company. From the testimony at the trial it is difficult to determine exactly what Walker did do in regard to informing

McJilton regarding the condition of the Nevada and Utah Companies, and persuading McJilton to make a bid at the Nevada sale. However, McJilton's testimony is susceptible of the interpretation that Walker did introduce the matter of bidding on the Nevada assets to McJilton, and then did inform him of the condition of the Nevada, Utah, and Reserve Companies. Walker in his deposition denies that he first interested McJilton in the Nevada assets, saying it was LaRue, the Nevada Receiver, who first suggested that McJilton make a bid, but Walker does admit that he gave McJilton whatever information he required concerning the financial condition of all three companies. At any rate, considering the testimony in the light most favorable to plaintiffs the result of Walker's efforts was to procure a bidder on the property who offered a substantial sum in cash, $26,156.94, for the assets. Out of this sum, and the subsequent liquidations made by McJilton of the Nevada assets, the bulk of the stockholders and creditors of the Nevada Company were paid, and the National Reserve Company stockholders got substantial dividends. It appears from the record that there were no other bidders for these assets, with the exception of Jenkins, whose bid the Nevada Court would not accept, because it was not properly supported by a tender of cash, but only supported by a postdated check. Thus, Walker succeeded in interesting a business man, who was willing to put up a substantial amount in cash for assets, which at best were speculative in value. In this situation it appears that Walker did the Nevada Company, and also the Utah and Reserve Companies, a service in getting a bidder for these assets. If it be said that Walker was responsible for the McJilton bid, it simply means that by his services a bid was obtained which enabled the Nevada Company to pay out its certificates in full. More about this bid later. Therefore, it is not material, and we shall not decide refinements as to Walker's duty to the corporation or its stockholders, as in any event, his actions did not prejudice them. This is not a case where the officers

sold the property and received a benefit therefrom. This property was sold by the receiver with approval of the court, and the officers received no part thereof, or emoluments therefrom.

(4) Was the price at which McJilton bought so unconscionably low as to amount to a fraud upon the stockholders, and require equity to set it aside? Let us keep the picture squarely in mind. The Nevada Company was in the hands of a receiver for liquidation; it had ceased to be a "going concern." The receiver, Nevada Bank Commissioner, *was determined* to sell the assets and wind up the business. Among those assets were some certificates in the Utah Company, upon which items alone must rest the claim of inadequacy of price. The Utah Company was, and for about four years had been, in receivership as insolvent. Efforts of the officers, of stockholders committees, of Bank Commissioner as receiver, and of others to reorganize the Utah Company had been unavailing. One reorganization scheme had been frowned upon by the court. None of the proposed reorganizations on a basis of 40¢ to 50¢ on the dollar had been able to secure the needed money nor the financial backing. Efforts to sell the assets had been unavailing. No buyers or bidders had been found. The only tentative bid at 25 cents on the dollar had strings attached to it which the receiver could not meet. On such a market as there was in Salt Lake City, the certificates were quoted at 10 cents a bid and 20 cents asked. The Nevada receiver appraised them at 11 cents. Ten months earlier, in a frenzied battle for control between groups with reorganization schemes, for about a month there had been considerable sales at 28 cents to 32 cents, but none of the groups of buyers had been able to finance a reorganization after buying at that price. The money market evidently did not consider it a good investment at that price. Even when those sales were on, $55,900 in shares was required as collateral for a $5200.00 loan, about 11 cents on the dollar, book value. Of the $41,562.68 book value certificates securing certain notes, only $32,000

were allowed as claims by the receiver of the Utah Company, which was shown by the Nevada receiver's inventory. The $55,000 block had not been acted upon, and might likewise be subject to a cut. It was also subject to the Tripp note, and the Layton contract. That is the picture of the Utah Company stock at the time of the Nevada sale. The Nevada assets were not without uncertainty. Some of those properties were involved in foreclosures, and other legal proceedings. Under these circumstances, it must be admitted that McJilton's purchase was not a sure thing, and that in fact, there was quite an element of risk and uncertainty involved in it. In addition to this, none of the assets purchased were liquid; all of them would and did require considerable expenditure of both time and money to realize anything like par value from them. Having all of these considerations in mind, it is apparent that no experienced business man would even consider putting up $26,156.94 were there not a chance of substantial profit. The risk of substantial loss was too great to tempt anyone, without prospects of a good profit.

Much of the evidence of value given below was based on what McJilton has since realized out of the stock of the Utah Company, which he bought along with the other Nevada assets. This is a hindsight valuation, and should not be a controlling one. It does not take into consideration the situation as the parties saw it at the time of the transactions, and after all, that is the time at which the value is to be determined.

The general rule regarding unconscionable bargains is that mere inadequacy of price is not per se a ground to avoid a bargain in equity, but equity will interfere if the inadequacy is such as to demonstrate some gross imposition or undue influence or to shock the conscience. *Sun Printing & Pub. Ass'n.* v. *Moore,* 183 U. S. 642, 22 S. Ct. 240, 46 L. Ed. 366; *Eyre* v. *Potter,* 15 How. 42, 14 L. Ed. 592; *Juzan* v. *Toulmin,* 9 Ala. 662, 44 Am. Dec. 448; *Brittin* v. *Handy,* 20 Ark. 381, 73 Am. Dec. 297; *Pollard* v.

*Lyman,* 1 Day, Conn., 156, 2 Am. Dec. 63; *Campau* v. *Godfrey,* 18 Mich. 27, 100 Am. Dec. 133; *Crane* v. *Conklin,* 1 N. J. Eq. 346, 22 Am. Dec. 519; *Seymour* v. *Delancy,* 3 Cow., N. Y., 445, 15 Am. Dec. 270; *Hough's Adm'rs* v. *Hunt,* 2 Ohio 495, 15 Am. Dec. 569; *Marker* v. *Van Gerpen,* 39 S. D. 648, 166 N. W. 151. The question then resolves itself to a consideration of whether under all the circumstances at the time of the sale there was such a gross undervaluation of the assets of the Nevada Company as to shock the conscience of the court.

As shown above, at the time of the Nevada sale, it appeared that the purchaser would only receive about $32,000 of the $41,562.68 book value certificates securing the two Reserve Company notes. Plaintiffs admit that the total amount of $41,562.68 would not be sufficient to pay the notes secured thereby, so the record at the time of the sale showed a considerable prospective loss on those notes. Some time after the sale, and with the expenditure of money, McJilton succeeded in proving and getting further certificates allowed, to a total sum of $40,469.81, which reduced the loss on those notes from the anticipated loss at time of purchase. Now as to the $55,944.19 block of certificates, at the time of purchase of the assets by McJilton, they were subject to possible disallowance by the receiver of the Utah Company; subject to the Tripp note for $5,448.78; and subject to the Layton contract for one-half the dividends. As shown above, they were quoted on the market at 10 cents bid and 20 cents asked, and appraised at 11 cents; one offer only had been made or procured at 25 cents, conditioned that the Utah Company was out of receivership, but offer withdrawn if the company in receivership, indicating that with the company in receivership, the certificates were not worth such a price.

To summarize then as to considerations of value of the Utah Company stock, valuation by hindsight, or from what has actually been realized from the stock does not take into consideration the amount of work done by McJilton in re-

organizing the board of the Utah Company, litigating claims against that company, and many other things which he was forced to do to protect his investment; nor does it take into consideration the expenses incurred by McJilton in doing this—hiring counsel and assistants for the necessary work; nor does it take into consideration any special skill and ability as a businessman which McJilton may have had, and without which the returns from the investment might have materially differed. In short, after putting in a considerable sum of money, McJilton spent the next nine months in Salt Lake City working on the reorganization, and he also spent a great deal of time on this work during the next three years, so it well may be that the return and profit from this investment is largely due to McJilton's own efforts in this regard.

There was some conflicting evidence on this point of value, but the preponderance of the evidence supports rather than being against the finding of the court that at the time of sale to McJilton, the value of the Utah certificates did not exceed 20 cents on the dollar, and the price paid by McJilton was not unconscionably low.

We find no substantial error in the record. The judgment is affirmed. Costs to respondents.

WOLFE, C. J., and McDONOUGH, and MOFFAT, JJ., and GEORGE A. FAUST, District Judge, concur.

PRATT, J., on leave of absence.