325 P.2d 899

**PRUDENTIAL FEDERAL SAVINGS & LOAN ASSOCIATION, a corporation, Plaintiff and Respondent,**

v.

**HARTFORD ACCIDENT & INDEMNITY COMPANY, a corporation, Defendant and Appellant.**

**FELT SYNDICATE, Inc., Plaintiff and Appellant,**

v.

**HARTFORD ACCIDENT & INDEMNITY COMPANY, a corporation, Defendant and Respondent.**

Nos. 8719, 8736.

Supreme Court of Utah.

May 20, 1958.

Moreton, Christensen & Christensen, Salt Lake City, for Hartford Accident & Indemnity Co.

Franklin Riter, Harry D. Pugsley, Salt Lake City, for Prudential Federal Savings & Loan Ass'n.

Woodrow D. White, C. Preston Allen, Salt Lake City, for Felt Syndicate, Inc.

CROCKETT, Justice.

Hartford Accident & Indemnity Company seeks reversal of judgments wherein it was held liable in amounts aggregating in excess of $90,000 on a performance bond it wrote upon Cassady Co. Inc., in connection with the latter's undertaking to construct homes in a residential subdivision known as "Morningside Heights" in Salt Lake County on which the plaintiff, Felt Syndicate, Inc., was entrepreneur and promoter, and the plaintiff, Prudential Federal Savings & Loan Association, was the financer. The cases were consolidated for trial and are so treated on this appeal.

The principal basis of Hartford's attack upon the judgments is that the plaintiffs themselves were guilty of breaches of their contractual duties, which prevented its principal, Cassady, from performing his obligations. Inasmuch as the trial court found in favor of the plaintiffs, they are entitled to have us review the evidence and every reasonable inference fairly to be drawn therefrom in the light most favorable to them.[1]

The difficulties with which we are here concerned had their origin in the failure of the plan to develop and build the Morningside Heights Subdivision to work out as the parties expected. Felt Syndicate, Inc. initiated the enterprise. It acquired a tract of land and had it platted. The plan was to construct 100 homes to be valued at approximately $10,000 each, a total of $1,000,000, and sell them to veterans who were eligible for government insurance on their loans under the Federal Servicemen's Readjustment Act of 1944, 38 U.S.C.A. § 693 et seq. Felt arranged with Prudential Federal Savings for financing of the homes.

1. Buehner Block Co. v. Glezos, 6 Utah 2d 226, 310 P.2d 517; Beck v. Jeppesen, 1 Utah 2d 127, 262 P.2d 760.

After inquiry and investigation of several contractors Felt selected Cassady, Co., Inc. to construct the homes upon terms satisfactory to the parties. It is of significance that it was known that Cassady lacked any extensive financing, and that partly because of that fact, he was required to furnish a performance bond to protect the interests of Felt and Prudential Savings (and also Pacific Coast Title Company whose rights are dealt with in Pacific Coast Title Insurance Company v. Hartford Accident & Indemnity Co., 7 Utah 2d 377, 325 P.2d 906. After some negotiations as to the form of such bond and the terms upon which Hartford would write it, a bond of $763,000 guaranteeing Cassady's performance was executed.

Further details of the plan were: that Veterans Administration approval of the plans would be procured; that Felt would be responsible for selling the homes; that after the buyer had been approved, he would make a suitable down payment and take title from Felt; a policy of title insurance would be procured from Pacific Coast Title Company; thereupon the buyer would execute a note and mortgage, bearing 4 per cent interest, to Prudential Savings, and would also execute to it written authority to retain the loan proceeds for disbursement to Felt, or to the contractor Cassady, or others as the latter directed, as they became entitled to the proceeds. After buyers had been found and the above-stated prerequisites had been complied with, including also the procurement of a title insurance policy and the execution and recordation of a mortgage in its favor, Prudential was to release money on the homes at certain stages of construction. The funds were to be disbursed through Associated Accountants, who had the duty to get lien waivers from subcontractors, laborers and materialmen.

Inasmuch as Prudential Savings did not desire to hold these 4 per cent mortgages for their life of 25 years because both the rate of interest and of repayment was too slow and they required their capital to be more active, the arrangement was that a larger financial institution, Prudential Insurance Company of America, would, upon the completion of the project and the government approval and insurance of loans, purchase the entire 100 mortgages from Prudential Savings.

Cassady began to construct the homes, using mass production methods in what he called a "straight line" assembly system. It was his obligation to complete the entire project within six months. Soon after operations commenced the project ran into difficulties largely because this "straight line" system did not accommodate itself to the sales program, either in sequence of construction or in amount. Buyers, quite naturally, did not select homes just in the order they were being built. The result was that homes nearly completed often

wanted for purchasers, while others already sold, but further down the production line were behind the buyers' demands to have work done on them. Cassady insisted that he would not move his construction equipment and material around the project to work on the houses in the order in which they were sold, and that the only way he could keep within his construction costs and meet his time schedule was by the "straight line" production method; meanwhile Prudential Savings insisted that it had neither authority nor duty under its agreement to disburse funds on any particular house until the buyer had been signed up and a mortgage was recorded in its favor.

Cassady's funds gradually became tied up in homes upon which he could not receive loan proceeds so he was unable to pay his help and material suppliers. Some of them refused to continue performance and filed liens to secure their claims. Other factors contributed to further perplex the situation: because of limited money and credit he could not purchase in large quantities or otherwise take advantage of the business position that healthy finances and credit affords. The Korean War also had its effect in inflating prices and making it more difficult to get labor and materials so that his expenses increased.

It is now plain from hindsight, which we all have in such generous measure, that the fundamental difficulty was that no provision had been made for a general project loan or other source of funds to cushion Cassady's operation as the work progressed. It had been assumed that the project could be financed by Prudential Savings making advances upon individual loans to each buyer. But delays and deficiencies in construction caused difficulties in getting Veterans Administration approval of the loans and this resulted in everybody wanting their money and no one being able to move forward. All of which caused a spiral of pressures of increasing intensity upon Cassady so that it became impossible for him to proceed with the project.

In an effort to alleviate the difficulties, the parties entered into two supplemental agreements, the final one, pertinent here, on February 16, 1951. Prudential Savings was authorized to withhold progress payments until corrections were made so that construction would meet V. A. inspection; Cassady's time limit for construction was extended for another three and a half months; the price allowed Cassady for the construction of each house was increased; the disbursement was changed from 75 per cent maximum to 90 per cent prior to V. A. approval; and the disbursal of funds through Associated Accountants was eliminated. Prudential Savings was given sole discretion to pay out the funds in such manner as in their judgment would expeditiously move the project forward to

completion. It is also of importance: that Prudential Savings waived certain rights which had inured to it because of Cassady's failures and delays; that Cassady therein agreed that Prudential Savings had thus far performed all of its obligations; and that he made no complaint against Felt up to that time.

The new plan likewise did not work out as expected, Cassady was again soon out of funds and unable to continue operations. The fact is that he never actually completed the construction of any of the houses to the point where the Veterans Administration would approve them for government insured loans. Plaintiffs served notice of default on Cassady and his bondsman, Hartford, for failure to meet the obligations of his contract.

As a result of the failure of Cassady, it was impossible for Prudential Savings to complete its transaction of placing the mortgages with the Prudential Insurance Company. The damages awarded to Prudential Savings represents the difference in the interest rate of 4% on these loans which it is now obliged to carry, as contrasted with 5½% which is the going rate of interest for loans of this character in the ordinary course of business without such government insurance. Felt's damages award was for loss of profit which it was to have received if the plan had gone on to completion.

■ The first obstacle to Hartford's contention that Cassady's failure to perform was in reality caused by various breaches by plaintiffs of their duties under the contract, including especially the fact that Prudential Savings did not make money available for him to pay for current operations, is the supplemental agreement referred to above. Hartford argues that it is not bound thereby, but only by the modification of certain portions of the original contract to which it expressly agreed; that it does not stand in the shoes of Cassady with respect thereto, nor with respect to his agreements in waiving breaches that had theretofore occurred. The trial court found that Hartford did become a party to the supplemental contract by giving its approval to the modifications of the portions of the original contract which it desired to have modified without expressly limiting its agreement to the other parts of the supplemental agreement. Had such been the intent of the parties, it would have been an easy matter to so indicate. Furthermore, Hartford seemed perfectly willing, and did accept the benefits of the extension of time, and the increases in price per house and of disbursement prior to V. A. approval for their principal Cassady. In the absence of expressly so reserving its rights, Hartford cannot accept the benefits of the contract and reject the burdens. The view taken by the trial

court that Hartford **was** bound by the supplemental agreement is amply justified.

■ While it may seem that the only practical way Cassady could have operated would have been to get money on each house as construction progressed, whether it had been sold or not, the fact is that the contract did not so require. Nor was there any requirement that Felt had to sell the houses in any particular order. Knowledge of Cassady's limited finances is partly what prompted the parties to insist that he procure a performance bond, and Hartford undertook to write it and received a premium for the bond to insure against just such a contingency as came about: that Cassady would not construct the homes as he agreed. Cassady was bound by the provisions of the contract he entered into and took upon himself the burden of carrying forward the construction under its terms. In view of the circumstances shown by the evidence we cannot say that it was unreasonable for the trial court to refuse to make the finding contended for by defendants that the cause of Cassady's failures was breaches by Felt in failing to produce buyers and/or of Prudential in failing to make money available when it should have done.

■ A separate claim of breach of contract worthy of note, which Hartford also urges should relieve it of liability, is that of failure on the part of Felt to provide electrical power for a short period at the beginning of construction. The fact that such power was not available did not have the effect of preventing construction or substantially delaying the project. The power supply was installed at a cost of approximately $2,000, and the project went forward. Reliance upon it as ground to nullify Cassady's entire contractual obligation is precluded by what has been said about the supplemental agreement above, which was executed after this alleged breach. Furthermore, it is a recognized principle of contract law that a breach of an insubstantial nature, which is severable and does not vitally change the transaction, does not release the other party completely from performing his obligations under the contract, but gives rise to a right for damages for any loss occasioned thereby.[2] This $2,000 was allowed as an offset in favor of Cassady and Hartford and that is all they are entitled to.

■■ Another claim of breach which Hartford sets up as a defense against Felt is that the latter violated a nonassignability provision of the contract by making a partial assignment of the money it had coming thereunder to Wright-Wirthlin, real estate brokers, to pay the latter for services they had rendered in selling the homes. It is obvious that the provision in the contract that no party should assign it without consent of the

2. See Restatement of Contracts, Secs. 274 and 313; Williston, Contracts, Sec. 805.

others was made because it involved personal relationships and personal services. Generally speaking, such covenants are enforceable. This is based on the reasoning that the parties have the right to select and insist upon the personalities with which they will sustain such personal relationships. However, such reasoning is valid only so long as such a contract is executory. After it has been performed and the only thing remaining is payment for the services rendered, the contract is no longer one for personal services and the reason for non-assignability no longer exists. After Felt had earned the money, Hartford and Cassady had no legitimate interest to protect in preventing assignment to Wright-Wirthlin because such an assignment could in no way adversely affect them.' Actually this assignment reacted greatly to the benefit of Hartford because it had the effect of preventing Felt from recovering for the portion it had assigned to Wright-Wirthlin, as will be explained later in connection with Felt's cross-appeal.

In a further assault upon the judgment in favor of Felt, Hartford takes a completely different tack: that Felt's corporate charter had been forfeited, ergo it could not maintain the action. Facts pertinent to this issue are: Felt was incorporated in Nevada; was duly qualified to do business in Utah in 1950 when the contracts were entered into; that thereafter it failed to pay taxes which subjected its charter to

forfeiture; that it later paid up and had its charter reinstated and again forfeited for the same cause during the pendency of this litigation. In support of its claim that Felt is under disability to maintain this action, Hartford relies on two sections of our statutes. The first is 16–8–3, U.C.A. 1953:

> "Any foreign corporation doing business within this state and failing to comply with the provisions of section 16–8–1, and 16–8–2 [qualifying to do business] shall not be entitled to the benefit of the laws of this state relating to corporations, and shall not sue, * * * in any of the courts of this state on any claim * * *."

It will be noted that the provisions of the above section apply only when a foreign corporation doing business within this state has failed to file the necessary documents to qualify to do business here. It has no application where the foreign corporation has in fact qualified to do business in the state (as Felt did here) and the corporate charter has been subjected to forfeiture for the failure to pay taxes.

The other section relied upon by Hartford is more directly applicable to Felt's position. Sec. 59–13–61 provides:

> "If a tax computed and levied hereunder is not paid * * * a foreign corporation, * * * shall thereupon forfeit its rights to do intrastate business in this state."

This section presents a more pertinent question: whether the forfeiture of the corporation's rights "to do intrastate business in this state" would preclude it from bringing a suit to protect rights which initiated while it was qualified to do business. It is noteworthy that Sec. 59–13–61 does not spell out any disability of corporations so disenfranchised to sue as does Sec. 16–8–3, quoted above, relating to failure to qualify.

█ We have found no case dealing precisely with the question posed. But this court has held that the bringing of one suit by a foriegn corporation to protect its rights does not constitute "doing business" within the state,[3] and that before the acts of a foreign corporation "could properly be classified as doing business within the State, it would have to be shown that there was some degree of continuity or regularity of such acts, coupled with some manner of entering into direct business transactions with others."[4] The logical conclusion from such holdings is that 59–13–61 would not prevent Felt from bringing suit to enforce the rights growing out of business transacted while it was franchised here, even though its franchise had been revoked, because the bringing of one suit under such circumstances would not be doing "intra-

state business" within the meaning of that section.

The final matter for consideration is the cross-appeal of Felt. It assigns error for failure to allow it to recover its full share of proceeds under the contract. The trial court held that as to a portion of its claim it had assigned to the real estate brokers, Wright-Wirthlin Company, it was not the real party in interest and therefore could not recover.

The pertinent facts are: By March of 1951 Felt owed Wright-Wirthlin $19,000 for sales commissions on houses the latter had sold; at that time Felt had $17,173.43 coming from undisbursed funds in the project. Under pressure from Wright-Wirthlin, Felt assigned $14,761.80 of such funds to Wright-Wirthlin. The evidence disclosed that at the commencement of this action, over four years later, Wright-Wirthlin still retained the assignment. But before the close of the evidence at trial they reassigned the interest back to Felt.

The effect and the time of the assignments just referred to are important because, when the case was tried, the time within which an action could be brought upon the Hartford bond had long since passed. So if Wright-Wirthlin owned the cause of action as to the portion assigned

---

3. Barse Live-Stock Co. v. Range Valley Cattle Co., 16 Utah 2d 59, 50 P. 630.
4. Western Gas Appliances, Inc., v. Servel, Inc., 123 Utah 229, 257 P.2d 950, 953;

see, also Marchant v. National Reserve Co. of America, 103 Utah 530, 137 P. 2d 331.

376

to it, the claim was outlawed and no action could be commenced; whereas, if Felt owned it, the suit had been commenced in time. Felt's argument on this proposition is that the purported assignment to Wright-Wirthlin was for purposes of securing their debt only; that it did not have the effect of divesting Felt of its interest in the claim, and that notwithstanding such assignment it retained a beneficial interest therein which would entitle it to sue thereon.

 It is true that there is an old doctrine that in actions at law the debtor has a right to pay his debt in solido to his creditor and is not obliged to recognize partial assignments which have the effect of creating a number of creditors. Even if this rule were recognized, Felt is in no position to question the propriety of its own act in assigning the debt. A more basic answer to the contention, however, is found in the fact that under our procedure rules of equity are recognized and administered in actions at law.[5] We have expressly held that the assignee of a part of a claim for damages is the "real party in interest" as to the part of the claim assigned to him.[6] The question as to what interest

the assignor actually retained in the res he assigned may be one of fact. But where it would controvert a written instrument it must be proved by clear and convincing evidence.[7] The trial court here refused to find as Felt contends, but was persuaded by the evidence that it had transferred the beneficial and legal interest in that portion of its claim to Wright-Wirthlin. It determined that Felt was therefore not the real party in interest and could not sue thereon; and that the assigned portion, being owned by Wright-Wirthlin, which had become stale in their hands, could not be revived by reassignment to Felt. We find nothing in the record which would justify disturbing that determination. It can hardly be questioned that if Wright-Wirthlin had commenced an action within time, and had presented a valid assignment, it could have maintained its action. It having permitted the time to go by and the claim to become barred, the trial court properly held that it could not breathe new life into the cause of action by reassigning it to Felt who had commenced an action within the time limit.

 In reference to the above matter Felt further insists that Hartford is

5. Utah Const. Art. VIII, Sec. 19: "There shall be but one form of civil action, and law and equity may be administered in the same action."
6. National Union Fire Ins. Co. v. Denver & R. G. R. Co., 44 Utah 26, 137 P. 653, 655.
7. Paulsen v. Coombs, 123 Utah 49, 253 P.2d 621, and Molyneux v. Twin Falls Canal Co., 54 Idaho 619, 35 P.2d 651, 94 A.L.R. 1264.

estopped from raising the defense that Felt was not the real party in interest as to the claim assigned to Wright-Wirthlin because it failed to raise that issue until at the close of Felt's evidence. Our new Rules of Civil Procedure were adopted to inject liberality into procedure. Rule 54 (c) (1) provides:

"* * * every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings. * * *"

Hartford's pleadings did give notice that it deemed the assignment a breach of contract which obviated its liability, and the question of Felt's assignment to Wright-Wirthlin was fully canvassed. All it was entitled to was notice of the issues being tried and an opportunity to meet them.[8] There is nothing to indicate that Felt was in any way misled or prevented from presenting all of the facts concerning the question as to whether it was the real party in interest on this claim.

The judgments are affirmed. Costs to plaintiffs (respondents).

McDONOUGH, C. J., and WADE and HENRIOD, JJ., concur.

WORTHEN, J., concurs in the result.

8. Taylor v. E. M. Royle Corp., 1 Utah 2d 175, 264 P.2d 279.