**SOCONY MOBIL OIL COMPANY, Inc.,**
**Appellant,**

v.

**CONTINENTAL OIL COMPANY, a corporation, Midwest Oil Corporation, a corporation, and King-Stevenson Gas and Oil Company, a corporation, Appellees.**

**No. 7480.**

United States Court of Appeals
Tenth Circuit.

Aug. 5, 1964.

Rehearing Denied Sept. 14, 1964.

Robert W. Richards and Coleman H. Hayes, Oklahoma City, Okl. (S. M. Groom, Jr., Oklahoma City, Okl., and C. B. Wallace and Ross Madole, Dallas, Tex., with them on the brief), for appellant.

Fisher Ames, of Ames, Daugherty, Bynum, Black, Ashabranner & Rogers, Oklahoma City, Okl. (Lewis G. Mosburg, Jr., of Mosteller, Andrews & Mosburg, Oklahoma City, Okl., for King-Stevenson Gas & Oil Co., appellee, Richard R. Linn and Robert E. Gill, Jr., Oklahoma City, Okl., for Continental Oil Co., appellee, with him on the brief), for Midwest Oil Corp., appellee.

Before PICKETT, LEWIS and BREITENSTEIN, Circuit Judges.

PICKETT, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the Western District of Oklahoma, requiring the appellant to assign certain interests in oil and gas leases to the appellees which the court found had been earned under the terms of a farm-out agreement, as amended. The principal issue here is whether the plaintiffs acted diligently in demanding an assignment of the oil and gas leases in question.

Prior to October 30, 1958, Magnolia Petroleum Company held leases on more than 9,000 acres of land in Dewey County, Oklahoma. On that date Magnolia, desiring to test the Chester formation in that area, entered into a farm-out agreement with Calvert Drilling Company,[1] the essence of which was that if Calvert drilled the test well, Magnolia would assign an undivided one-half interest in the leases above the base of the Chester formation (a depth of about 12,950 feet). Magnolia expressly reserved all of its rights in the formation below the base of the Chester.[2] This test well, known as the #1 Brundage, was completed as a dry hole in April, 1959. On May 4, 1959 Magnolia wrote to Calvert, Midwest and King-Stevenson, stating in part that "You have earned your assignment under the above letter agreements, but as you know, we have been renewing leases in this area and will furnish you the assignment when we have had time to get all of the renewals processed through our Dallas Office." No assignments were executed.

Before completion of the Brundage well, Magnolia had completed a deep-test well as a commercial producer of gas in the vicinity of the farm-out area.

1. A farm-out agreement in the oil and gas industry is, generally, an executory contract to assign oil and gas lease rights in consideration of the completion of drilling obligations and the performance of other required obligations. Petroleum Financial Corp. v. Cockburn, 5 Cir., 241 F.2d 312; Jenkins v. Pappas, 383 P.2d 645, (Okl.1963).

2. Subsequent to the original agreement, Magnolia was merged into the appellant Socony Mobil Oil Company, Inc. Calvert with the approval of Magnolia, has assigned a one-third of its interest in the agreement to each Midwest Oil Corporation, King-Stevenson, and Continental. The Continental assignment was not submitted to or approved by Magnolia or its successor, Socony Mobil.

It then desired to test the deep formations of the farm-out leases and #1 Herring was drilled and completed as a dry hole. During this time Magnolia took new leases on over 4,000 acres of land in the farm-out area although the existing leases had not expired. Thereafter, by letter agreement of September 23, 1960, the parties arranged for a division of costs in reworking the Herring well to test the sands above the Chester formation. A question then arose as to the rights and obligations of the parties concerning the renewed leases. It was agreed that the Calvert group would pay $27,742.50 as their share of the renewal costs and delay rentals. This agreement was set forth in a letter dated September 30, 1960, from Mobil Oil Company to Calvert Drilling, Inc.[3] The workover of the Herring well was completed on October 24, 1960, with unfavorable results. Thereafter the appellees did not waive the assignments referred to, nor did they demand the lease assignments or offer to pay the amount agreed upon. Mobil made no demand for the payment. After Continental acquired the Calvert interests, it discovered in March of 1961 that assignments had not been made to Calvert. It then made inquiry concerning the transfer of the leases, and on August 3, 1961, wrote Mobil requesting the assignments. Mobil replied that Continental had acquired no interest in the leases from Calvert as it, together with Midwest and King-Stevenson, had waived all assignments under the terms of the agreement. This was the first indication by Mobil that it did not intend to recognize the right of the Calvert group to the assignments.

■ The terms of the September 30, 1960 agreement are unambiguous. Calvert, Midwest and King-Stevenson obligated themselves to pay an agreed amount.

3. This letter reads:
"Mobil Oil Company
A Division of Socony Mobil Oil
Company, Inc.
Oklahoma City 1, Oklahoma,
September 30, 1960.
Calvert Drilling, Inc. 1200 Petroleum Club Building, Oklahoma City, Oklahoma
Gentlemen:
Farmout of 9030 acres, more or less in 16 N–16W & 16N–15W Dewey County, Oklahoma.
Under the terms of our farmout agreement dated October 30, 1958, and subsequent amendments, the Calvert #1 Brundage was drilled and abandoned in accordance with the terms of the agreement.
The acreage earned is to be assigned as follows:
Und. ⅓ int. to Calvert Drilling, Inc.
Und. ⅓ int. to Midwest Oil Corporation
Und. ⅓ int. to King-Stevenson Oil Company
Leases earned are to be assigned down to the base of the Chester and cover full interest in the NW SW and W/2 NE SW Section 12–16N–16W and the NE Section 22–16N–16W, and cover an undivided ½ interest in whatever Mobil had under lease at the time of the agreement as shown in the plat attached thereto.

Subsequent to the agreement, it has been necessary to renew 4,110 acres within the contract area for which we paid $25 per acre at a total cost of $102,750. You have agreed to pay ¼ of this renewal cost, being $25,687.50. In addition, we have paid one delay rental on this renewed acreage at a cost of $4,110.
You have agreed to pay ½ of this rental, or $2,055. We assume that these amounts will be divided equally by Calvert, Midwest and King-Stevenson, so that your ⅓ of $27,742.50 would be $9247.50. Your commitment to pay these amounts was conditional upon the outcome of the workover at the Mobil #1 Herring well in Section 22, and you have the election to waive assignments at the completion of the workover, and such waiver would cancel any renewal or rental payments as outlined.
We do not purpose [sic] to bill you on the rentals paid on the balance of the acreage, that is, those leases within the contract area that have not been renewed, until the actual assignment has been made. After assignment you will be billed for ½ of the rentals paid on all leases assigned from the date of the assignment in accordance with our farmout agreement.
Yours very truly,
A. J. Sanders."

as their share of the costs of the renewal leases and delay rentals which had been paid by Mobil. They reserved the right to cancel out these obligations by an election to waive assignment after the results of reworking the Herring well became known. Under the terms of the agreement, the rights and obligations of the parties were fixed. The Calvert group was not required to take any action unless it desired to waive the assignments. In the absence of a waiver, Mobil was required to deliver the assignments upon payment of the amount due. Neither party took any action to consummate the contract. Such delay appears to have been the usual course of conduct of the parties from the time of their first association in 1958.[4] There is no evidence in the record that there was a material change in the situation of the parties between the date of the contract and the filing of this action, and no substantial evidence of a material change in the value of the oil and gas leases.[5]

It is Mobil's position that the court erred in granting specific performance of the September 30, 1960 contract, because the parties seeking that relief had not acted promptly in electing to participate in the renewal leases as well as asserting their claim for relief. Generally, the doctrine of laches applies only in cases where, because of the lapse of time, it would be inequitable to permit a party to enforce his legal rights. In other words, the delay must result in prejudice or an injustice to another. Pfister v. Cow Gulch Oil Co., 10 Cir., 189 F.2d 311, cert. denied 342 U.S. 887, 72 S.Ct. 177, 96 L.Ed. 665; Shell v. Strong, 10 Cir., 151 F.2d 909 [6]; Hoehn v. Crews, 10 Cir., 144 F.2d 665, aff'd 324 U.S. 200, 65 S.Ct. 600, 89 L.Ed. 870. Whether a delay has been injurious to a party depends upon the facts and circumstances of each case. Phelan v. Roberts, 182 Okl. 202, 77 P.2d 9; Carnes v. Thomas, 280 P.2d 474, (Okl.1955). It has been held that where the value of the subject matter of a contract such as oil and gas

4. As to the conduct of the business between the parties, the trial court found:
 "All dealings between Mobil and its farmoutees were carried out in an easy fashion, and with complete confidence that, in time, all problems would be adjusted. All parties felt that they were dealing with responsible people. * * *"
 "The passage of time prior to the inquiry as to the furnishing of assignments was not occasioned by an unconscionable motive on the part of any of the plaintiffs or their predecessors in interest or any desire to capitalize on any change in condition that might occur, and was in keeping with the general course of dealings between Mobil and its farmoutees throughout the period subsequent to October 30, 1958."

5. The trial court found:
 "There was no material change in the value of the subject leases after September 30, 1960. The value of the leases was established by the wells to the northwest and the drillstem test of the Horton Well in Section 14–15N–15W in August, 1960, prior to the September 30, 1960, amendment. The Dobbins Well, completed in May, 1961, was three miles from the farmout area and four miles from the nearest lease involved in this

suit and gave no further information as to the probable productivity of the farmout area itself, but simply confirmed a previously established trend. There was no change in the cost of leases in the farmout area prior to the time of filing this suit. There is no satisfactory evidence of any material change in the value of the subject leases after September 30, 1960.
 There has been no change in the position of the parties subsequent to September 30, 1960. Mobil has suffered no detriment or prejudice. There are no circumstances which would make it inequitable to grant specific performance of the farmout agreement, as amended."

6. In Shell v. Strong, 10 Cir., 151 F.2d 909, 911, the court said:
 "Lapse of time alone does not constitute laches. Delay will not bar relief where it has not worked injury, prejudice, or disadvantage to the defendant or others adversely interested.
 "Since laches is an equitable defense, its application is controlled by equitable considerations. It cannot be invoked to defeat justice, and it will be applied only where the enforcement of the right asserted will work injustice."
 (Footnotes omitted).

**442**

property changes rapidly, or where there has been a substantial change in its value, specific performance is available only where the rights are asserted diligently and without unreasonable delay. Nelson v. Hamra, 127 Okl. 141, 259 P. 838; Parker v. Ryan, 143 Okl. 187, 287 P. 1006; Pfister v. Cow Gulch Oil Co., supra; Texas Co. v. Herring, 8 Cir., 19 F.2d 56; Taylor v. Salt Creek Cons. Oil Co., 8 Cir., 285 F. 532. In any event, the defense of laches is available only when there has been some detrimental result from the delay in asserting rights. Bechler v. Kaye, 10 Cir., 222 F.2d 216, cert. denied 350 U.S. 837, 76 S.Ct. 75, 100 L.Ed. 747; Chisholm v. House, 10 Cir., 183 F.2d 698; Yates v. American Republics Corp., 10 Cir., 163 F.2d 178; Alexander v. Phillips Pet. Co., 10 Cir., 130 F.2d 593; Stallings v. White, 194 Okl. 649, 153 P.2d 813. We find no error in the trial court's conclusion that the delay in making demand for the assignments caused no detriment or prejudice to the rights of Mobil, and that specific performance was appropriate under the circumstances.

■■ The appellants' last contention, that is, that Calvert's assignment to Continental was invalid because not approved by Mobil, is without merit. The original farm-out agreement contained the requirements that assignments be approved, but the subsequent agreements did not. The original agreement became fully executed, except for making the assignments, when the Brundage well was completed as a dry hole. Mobil's letter of May 4, 1959 admits that the assignments had been earned. The authority cited by Mobil correctly states the rule that a covenant not to assign is valid so long as the contract is executory, but when all that remains to be done is the payment, the reason for nonassignability no longer exists. Cheney v. Bilby, 8 Cir., 74 F. 52, cert. denied 164 U.S. 705, 17 S.Ct. 992, 41 L.Ed. 1180; Prudential Fed. Svgs. & Loan Ass'n v. Hartford Acc. & Indemn. Co., 7 Utah 2d 366, 325 P.2d 899.

Affirmed.