**KORTE CONSTRUCTION COMPANY,**
Plaintiff/Appellant,

v.

**DEACONESS MANOR ASSOCIATION,**
Defendant/Respondent.

No. 68884.

Missouri Court of Appeals,
Eastern District,
Division Four.

June 11, 1996.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 24, 1996.

Application to Transfer Denied
Sept. 17, 1996.

Greensfelder, Hemker & Gale, P.C., Michael E. Wilson, St. Louis, for Appellant.

Stone, Leyton & Gershman, Paul J. Puricelli, St. Louis, for Respondent.

PUDLOWSKI, Presiding Judge.

Appellant Korte Construction Co. (Korte) filed a Petition for Stay of Arbitration in the Circuit Court for the City of St. Louis to enjoin respondent Deaconess Manor Association (DMA) from arbitrating certain claims against it. Korte contended that while a valid arbitration agreement existed between it and one Orchard House Project (OHP), OHP's attempted assignment to DMA of its contractual rights (including arbitration rights) and claims arising thereunder was invalid. Rejecting Korte's argument, the trial court issued an order partially granting and partially denying Korte's petition to stay the arbitration proceeding instituted by DMA. Korte now challenges the component of that ruling adverse to it.

### Motion To Dismiss Appeal

DMA's opening salvo before this court is that the instant appeal is neither authorized by statute nor in accordance with appellate procedure. As DMA reminds us, an appeal is only appropriate where authorized by statute. DMA argues that because RSMO § 435.440 (1994), a statute authorizing appeals from trial court rulings concerning arbitrations, does not authorize appeal of a trial court order denying a stay of arbitration, there can be no appeal of the trial court ruling in this case. DMA is quite correct that while § 435.440(1) authorizes appeal of an order denying an application to compel arbitration and § 435.440(2) authorizes appeal of an order granting an application to stay arbitration, appeal from an order denying a stay of arbitration is not contemplated by that statute.[1]

Korte responds that § 435.440 is a statute which authorizes appeals where they otherwise would not lie, and that it in no way derogates from the primary authority for

---

1. We reject Korte's suggestion that § 435.440(6) authorizes the present appeal. That section permits an appeal of "a judgment or decree entered pursuant to the provisions of §§ 435.350 to 435.470." This provision simply means that a party aggrieved by an arbitration award may appeal a trial court's order entering judgment on such award.

pursuing an appeal from a trial court judgment found at § 512.020. We agree. Section 512.020 is the statutory progenitor of the cardinal rule of appellate jurisdiction; i.e., that the necessary predicate for an appeal is entry by the trial court of a final judgment which disposes of all issues and parties in a given matter. *Rea v. Moore*, 891 S.W.2d 874, 874–75 (Mo.App. S.D.1995). The relevant precedents do not support the conclusion that § 435.440 is the exclusive avenue through which a trial court order concerning arbitration may be appealed.

In *Young v. Prudential Securities*, 891 S.W.2d 842 (Mo.App. E.D.1995), the parties had entered a contract containing an arbitration clause. When a dispute arose, plaintiff filed an action in the trial court, and defendant responded with a motion to compel arbitration. The trial court denied defendant's motion, and defendant appealed. While this court found the appeal authorized under § 435.440 even though the trial court's ruling was not a "final judgment" within the meaning of § 512.020, the analysis expounded in that case clearly demonstrates that an appeal is proper if it is authorized under either of the cited statutory provisions. *See Young* at 843–44.

*McClellan v. Barrath Construction Co.*, 725 S.W.2d 656 (Mo.App. E.D.1987), supports our conclusion with equal force. In *McClellan*, the plaintiff filed suit seeking a declaratory judgment and damages, and the defendant answered with a motion to compel arbitration, citing the arbitration clause in the contract between the parties. The trial court granted the defendant's motion, and the plaintiff appealed. The defendant contested the appeal on the ground that no final judgment had been entered by the trial court. Only after determining that the appeal was not authorized under either § 435.440 or § 512.020 did this court dismiss the appeal.

The only case of which we are aware that is facially supportive of DMA's position is *State ex rel. MCS Building Co. v. KKM Medical*, 896 S.W.2d 51 (Mo.App. W.D.1995). When the contract dispute arose in that case, the defendant filed a petition in the trial court seeking a declaration that the arbitration clause in the contract entered by the parties was invalid. The trial court ruled that the arbitration clause was valid, and when the defendant appealed this ruling, the court dismissed the appeal because the trial court's order was not appealable under § 435.440. Because *KKM Medical* entirely fails to discuss possible appellate authorization under § 512.020, the case suggests on its face that a trial court order concerning arbitration may only be appealed pursuant to § 435.440. Korte states in its brief, however, that review of the legal file in *KKM Medical* reveals that the trial court order in that case did not dispose of all of the issues raised in the defendant's petition, so that the trial court order was not a final judgment appealable under § 512.020 in any event. We do not find it necessary to delve into the legal file of a decided case in order to resolve the instant issue, however. To the extent that *KKM Medical* is inconsistent with the Eastern District precedents discussed above we decline to follow it.

■ Respondent insists that allowing an appeal of any trial court order concerning an arbitration other than those specifically listed in § 435.440 undermines the legislature's announced preference for arbitration. But it scarcely need be said that such a preference only applies where a valid arbitration agreement exists between the litigants. Resolution of this legal issue must occur before the parties are forced to submit to arbitration, and we believe full resolution must include the right to appeal.

■ Thus, this appeal, despite not enjoying the sanction of § 435.440, is nonetheless authorized if the order entered by the trial court is a "final judgment" within the meaning of § 512.020. The gravamen of the "final judgment" rule is that a judgment is only appealable where it disposes of all parties and all issues in a particular matter. When making this determination, the scope of the particular matter is defined by the issues raised and the parties joined in the pleadings that were before the trial court when it entered its judgment. *See Thomas v. Nicks*, 867 S.W.2d 676, 677 (Mo.App. E.D.1993). In the present case, the pleadings consist of Korte's petition for a stay order (and a mem-

orandum in support thereof), DMA's memorandum in opposition to Korte's petition, and a stipulation of uncontested facts. Although the argumentation found in these documents is rather involved (as will be seen presently), the crux of the matter before the trial court was whether a valid agreement existed between the parties requiring the arbitration of breach of contract, express and implied warranty, and negligence claims. The trial court did not decide that DMA had adduced proof sufficient to make a submissible case on these claims, nor need it have (see below). The only parties before the court via these pleadings were Korte, DMA, and the Hoffman Partnership, which is an architectural firm with whom Korte has reached a settlement; it is undisputed the Hoffman Partnership has now disappeared from this lawsuit. The trial court's order, in part granting and in part denying Korte's petition, coupled with its supplementary order clarifying its original order, unquestionably adjudicates the legality of the assignment of every right and claim which DMA asserts and, therefore, stands as a "final judgment" within the meaning of § 512.020.[2]

■ DMA also urges that we dismiss this appeal because Korte filed its notice of appeal out of time. The trial court entered its initial Order on April 18, 1995. On April 28, Korte filed a document which it captioned "Motion for Reconsideration." On July 24, the trial court entered its modified judgment. On August 2, Korte filed its notice of appeal.

Under Rule 73.01(a)(4), a party may file a motion for a new trial or a motion to amend a judgment within thirty days of the trial court's entry of judgment. Under Rule 81.05(a), if a motion for a new trial is timely filed, the judgment becomes final ninety days after the motion is filed, unless the court rules on the motion before those ninety days elapse; if so, the judgment becomes final thirty days after entry of judgment or on the date of disposition of the motion, whichever is later. Rule 81.04(a) requires that a party file its notice of appeal no later than 10 days after the judgment appealed from becomes final.

■ Thus, if Korte's April 28 motion for reconsideration qualifies as a motion for new trial within the meaning of Rule 81.05(a), then Korte's Notice of Appeal was timely filed. Although Korte should have noted its motion as a motion for new trial rather than a motion for reconsideration, it is well established that a party will not be denied substantive review merely because it mislabeled its new trial motion. *Koerber v. Alendo Building Co.*, 846 S.W.2d 729, 730 (Mo.App. E.D.1992).

DMA's motion to dismiss this appeal is denied.

*Validity of the Assignment*

■ The parties agree that the contract at issue in this case involved interstate commerce and, therefore, the FAA controls the substantive arbitration issues. *Woermann Const. Co. v. Southwestern Bell Telephone Co.*, 846 S.W.2d 790, 792–93 (Mo.App. E.D. 1993). A determination of the parties bound by an arbitration agreement where an attempted assignment has occurred is a sub-

**2.** Although unavailable to the parties, there is another appellate decision, recently handed down, which should be discussed in connection with these issues. *Duggan v. Zip Mail Services, Inc.*, 920 S.W.2d 200 (Mo.App.1996) involved a dispute arising from an employment contract which contained an arbitration clause. The plaintiff had filed suit in the circuit court alleging, inter alia, breach of contract, and the defendants had answered with motions to stay litigation and to compel arbitration. The trial court denied these motions, citing § 435.460 RSMo, which states that an arbitration clause is not enforceable unless it contains the following statement adjacent to or above the signature lines: "THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES." This statement

was missing from the contract executed by the parties.

On appeal, this court ruled that because the arbitration clause was enforceable under the Federal Arbitration Act (FAA), the *provision of* the Missouri Arbitration Act requiring this notice statement (and thereby precluding arbitration) was preempted. Indeed, this court ruled in *Duggan* that any provision of Missouri law which precludes arbitration where it would otherwise be authorized under the FAA is preempted. However, the rule announced in *Duggan* does not mean that application of the final judgment rule of § 512.020, as in the present case, is preempted. Section 512.020 simply dictates when a judgment is appealable; it has no per se effect on the validity of any arbitration clause.

stantive issue and, is therefore, a question of federal arbitration law. *I.S. Joseph Co., Inc. v. Michigan Sugar Co.,* 803 F.2d 396, 399–400 (8th Cir.1986). In deciding this issue in *Michigan Sugar,* the Eighth Circuit simply looked at the language of the relevant contractual documents, supplementing its analysis with "the common law of contract"—i.e., state law. Furthermore, Article 7.1.1 of the contract at issue in this case states that Missouri law "governs the contract." Accordingly, we apply Missouri law in evaluating this appeal.

■ Any justification of DMA's attempts to force Korte to the arbitration table hinges at the outset on the validity of the assignment executed by OHP and DMA. Both parties agree, as they must, that no legal relationship exists between them unless the assignment is valid. The assignment reads in relevant part:

"1. Assignor [OHP] hereby sells, assigns and transfers unto Assignee [DMA], all of Assignor's right, title and interest, if any, in the following:

\* \* \*

B. All existing warranties and guaranties covering the [Project] Improvements of which Assignor is the beneficiary (if any), to the extent such warranties and guaranties are assignable;

C. All contracts and agreements affecting the [Project] Improvements (if any), to the extent such contracts or agreements are assignable;

\* \* \*

G. Any and all claims or causes of action which the Assignor may have in connection with the development, use or operation of the [Project] prior to the date hereof.

The cloud over the assignment is cast not by its own language, but by a provision in the construction contract (the contract) executed by Korte and OHP. That provision, denominated in the contract (and henceforth in this opinion) as Article 7.2.1, must be quoted in its entirety:

7.2.1. The Owner [OHP] and the Contractor [Korte] each binds himself, his partners, successors, assigns, and legal representatives to the other party herewith and to the partners, successors, assigns and legal representatives of such other party in respect to all covenants, agreements and obligations contained in the Contract Documents. Neither party to the Contract shall **assign the Contract or sublet it as a whole without the consent of the other**, nor shall the Contractor assign any money due or to become due to him hereunder, without the previous written consent of the Owner. (emphasis added)

DMA concedes that OHP did not obtain Korte's consent before executing the assignment. Thus, the hurdle DMA faces in defending the validity of the assignment is obvious.

■ In ruling the assignment valid, the trial court interpreted Article 7.2.1 to prohibit only an assignment which assigned the whole contract without the consent of the non-assigning contractual party. (As will be discussed below, the trial court then went on to hold that OHP had only assigned part of the contract, and that this partial assignment was not violative of Article 7.2.1). It is obvious from the treatment the trial court gives the question that it interpreted the phrase "as a whole" to modify both assignment and subletting (i.e., subcontracting) of the contract. This interpretation ascribes an extraordinary degree of carelessness to the drafting of the quoted language and is, therefore, insupportable. It is far more reasonable to conclude that if the parties had intended to permit partial assignments and subletting (regardless of the non-assigning party's consent) and to prohibit only unconsented to assignment and subletting which transfer the contract as a whole, the relevant sentence in Article 7.2.1 would read: "Neither party to the contract shall assign or sublet the contract as a whole...." As the sentence actually reads, subletting the contract as a whole without the consent of the other contractual party is clearly prohibited, but unconsented to assignment of the con-

tract is prohibited whether in whole or in part.[3]

■ This construction does not necessarily require a finding that the assignment is invalid, however. The briefs of the parties, as well as the order of the trial court, display considerable confusion concerning a doctrine which validates certain assignments, notwithstanding the assignor's failure to comply with the terms of a non-assignment clause (i.e., failure to obtain the consent of the other party to the contract), where a contract is no longer executory. Because this doctrine is both poorly understood and crucial to resolution of this appeal, we will discuss it at some length.

The doctrine, as it exists in Missouri, appears to have its genesis in *Ocean Accident & Guarantee Corp. v. Southwestern Bell Telephone Co.*, 100 F.2d 441 (8th Cir.1939). In that case, Kansas City Telephone (KCT) had taken out an insurance policy from Ocean Accident (Ocean) which required Ocean to indemnify KCT against certain tort liability. The policy contained a clause which required KCT to obtain Ocean's consent before assigning its rights under the policy. Several KCT employees were injured and sought damages from KCT; these claims were of the variety covered by the policy Ocean had issued to KCT. Before these claims were resolved, KCT was subsumed by Southwestern Bell Telephone (SWBT), and pursuant to this merger, KCT assigned its rights under the Ocean insurance policy to SWBT; KCT did so without obtaining Ocean's consent. The injured employees (employees of SWBT after the merger) looked to SWBT for compensation for their injuries, and SWBT in turn sought indemnification from Ocean, under the policy originally issued to KCT. Ocean claimed it had no obligation to indemnify SWBT, as it had never consented to the KCT–SWBT assignment.

■ While acknowledging that KCT had not assigned its rights under the policy in accordance with the terms of contract, the Eighth Circuit held that assignment was nonetheless valid because the events creating the liability (and thus the need for indemnification under the policy) occurred while the policy was still held by KCT. The court's reasoning seems to have been that the consent requirement in the policy reflected the fact that different insureds pose different degrees of risk (so that Ocean might choose to veto an assignment to a high risk insured), but that since the liabilities for which SWBT sought indemnification accrued while the injured employees worked for KCT (and while KCT was the insured), this consideration should not be determinative. Thus, under the court's reasoning, if a party attempts to assign its rights under a contract (though it does not do so in conformance with the contractual terms) that assignment is valid if the contract rights assigned will not be affected by a change in the personal character of the party holding those rights; i.e., if the contract is no longer executory vis-a-vis the assigning party. Courts in other jurisdictions have employed similar analyses to achieve this result; *See Ford v. Robertson*, 739 S.W.2d 3, 5 (Tenn.App.1987) and *Prudential Federal Savings & Loan Assoc. v. Hartford Accident & Indemnity Co.*, 7 Utah 2d 366, 325 P.2d 899 (1958). The insurance

---

3. Apparently recognizing the defect in the trial court's interpretation of the language in Article 7.2.1, DMA argues that the same conclusion can be reached through a different interpretation of that Article. Thus, DMA argues that the parties must have intended to permit partial assignments as a general rule, since the last clause of Article 7.2.1 *names an exceptional circumstance in* which a partial assignment does require the consent of the other party: "nor shall the Contractor [Korte] assign any money due or to become due to him hereunder, without the previous written consent of the Owner [OHP]." (It is clear that this was not the trial court's interpretation, since *the trial court omits this clause from its opinion* entirely.)

While we applaud DMA's ingenuity in making this argument, we do not find it persuasive. We interpret the term "contract" as used in Article 7.2.1 to mean "contractual obligations." Korte's collection of "money due or to become due" was not a contractual obligation, but a contractual right. It seems to us this clause was simply intended as a means of protecting OHP in case Korte assigned its account receivable under the contract, so as to prevent the incurring of double liability. Also, the fact that the "without the previous written consent of the Owner" phrase was repeated in this clause indicates to us that the parties regarded the two clauses as addressing separate concerns, and they are, therefore, analytically distinct.

policy in *Ocean Accident* was no longer executory because (apparently) the policy had expired so there was no possibility of Ocean having to defend lawsuits brought against SWBT by plaintiffs who were SWBT employees at the times their causes of action accrued.

Despite Korte's belief to the contrary, *Ocean Accident* has nothing to do with the assignability of claims. KCT, the assignor in that case, did not have any claims—it was the party being sued. What it assigned was the contractual right to indemnification under an insurance policy. Of course, every right can potentially serve as the predicate for a cause of action when such right is violated; but this does not mean that the two concepts may be treated interchangeably. In *Ocean Accident,* Ocean had not refused to indemnify KCT, nor apparently had KCT demanded indemnification; clearly, then, KCT could not have been assigning a cause of action against Ocean, as none had yet accrued. This is not to say that a party to a contract cannot validly assign causes of action arising from that contract, notwithstanding noncompliance with a consent provision; this is possible (as will be seen momentarily), but *Ocean Accident* provides no authority for doing so.

 We now examine whether the attempted assignment in this case falls within the doctrine created in *Ocean Accident.* The central concern of this inquiry is whether the contract had been fully executed at the time OHP attempted to assign it. The parties seem to agree that the contract remained executory (and thus ineligible for *Ocean Accident* treatment) unless both parties had completely fulfilled all contractual obligations. This is puzzling, as *Ocean Accident* itself seems merely to require that the assigning party's performance be complete. In any event, we find that the contract was no longer executory. There is no suggestion to this court that OHP still owed Korte contractual obligations on the date of assignment. In support of its argument that it had not fully executed *its* side of the contract as of July, 1993, Korte cites the following contractual provision:

13.2.2. If, within one year after the Date of Substantial Completion of the Work or a designated portion thereof or within one year after acceptance by the Owner of designated equipment or within such longer period of time as may be prescribed by law or by the terms of any applicable special warranty required by the contract documents, any of the work is found to be defective or not in accordance with the Contract Documents, the Contractor shall correct it promptly.

The parties agree that the date of substantial completion of the project was in January, 1990, and the contract did not require any "applicable special warranties." Thus, Korte's argument that it was still under contractual obligations at the time of the alleged assignment is premised on the phrase "such longer period as may be prescribed by law." Citing *McDevitt and St. Co. v. K–C Air Conditioning Service,* Inc., 203 Ga.App. 640, 418 S.E.2d 87 (1992), Korte interprets this phrase as a reference to the statute of limitations applicable to breach of contract claims, and accordingly argues that this five year period ran from January, 1990 to January, 1995 and thus extended well beyond the date of assignment. This tortured interpretation flies in the face of reason. Statutes of limitations are imposed on claims, not on contracts, and thus place limits on the ability to obtain damages, not the ability to enforce repair obligations (much less do they **create** repair obligations). The function of statutes of limitations is to bar plaintiffs from seeking redress for claims that are deemed "stale," and there is no apparent reason why they should be contorted into warranty provisions. (Indeed, *McDevitt* is the only case interpreting this phrase as a reference to a limitations period, and the *McDevitt* court provides no reasoning for its decision to do so.) Especially in light of the fact that the contract at issue in this case is a form contract drafted by the American Institute of Architects for use all over the United States, the far more reasonable conclusion is that the "longer period of time" that "may be prescribed by law" is a warranty period imposed on construction contracts by statute in some states. Since neither the briefs submitted by the parties nor our independent research reveals

the existence of any such law in Missouri, we find that there is no longer a period of time prescribed by law in which Korte was obligated to repair defects in the construction. Accordingly, we hold that the contract was no longer executory on the date of the OHP–DMA assignment and, therefore, under *Ocean Accident*, the assignment to DMA of OHP's contract rights (including the right to have disputes settled by arbitration) was valid. Before we examine what categories of rights were actually assigned, we must analyze whether any causes of action were also validly assigned.

■■■ As has already been established, contract rights are distinct from causes of action which accrue from the violation of such rights. Thus, the prohibition in the contract against assignment of the contract without the consent of the other party does not bar assignment of causes of action accruing from breach of the contract. *See Rosecrans v. William S. Lozier, Inc.*, 142 F.2d 118, 124 (8th Cir.1944) (party who had fully performed contractual obligations could assign a claim for breach, notwithstanding noncompliance with a clause requiring consent of the other party (to any assignment of contract rights).)

■■■ Korte argues, however, that OHP's attempted assignment of accrued causes of action was invalid apart from OHP's failure to obtain Korte's consent. Korte contends that the assignment impermissibly split the causes of action possessed by OHP, rendering the assignment invalid. This argument has little merit and can be disposed of briefly. Korte's "splitting a cause of action" contention holds that OHP violated this rule by retaining claims accruing after the date of the assignment while assigning to DMA claims in existence on the date of assignment. For a number of reasons, this argument misses the mark. The OHP–DMA assignment covers "any and all claims and causes of action which [OHP] may have in connection with the development, use or operation of the [Project] prior to the date hereof." Korte contends that the phrase "may have" indicates that only accrued claims were assigned, while DMA glosses the same language to mean "may have in the future."

Even assuming Korte is correct that the phrase "may have" refers only to claims in existence at the time of the assignment, our earlier holding that OHP assigned all of its remaining contract rights to DMA requires the conclusion that causes of action accruing after the date of the assignment also accrued to DMA. This is so because no cause of action can accrue to one who lacks the rights upon which such cause would be based. The assignment thus transferred all past, present and future causes of action arising from the contract, and the rule against "splitting a cause of action" which Korte presses has no application.

■■■ Nor, in fact, would this rule be violated in any event. The rule against splitting a cause of action holds that where a cause of action has accrued, the holder of that cause may not assign the right to recover part of the damages available under the claim while retaining the right to recover the balance of the damages himself. *Subscribers, etc. v. Kansas City Public Service Co.*, 230 Mo.App. 468, 91 S.W.2d 227, 231 (1936). The rule is for the benefit of the defendant (sometimes called the debtor) who, the reasoning goes, should be permitted to shoulder his liability (or pay his debt) as a whole rather than piecemeal. This rule only prohibits severance of the damages from a single cause of action, not severance of distinct causes of action arising from a single contract, transaction or occurrence. Korte, however, attempts to conflate the rule against splitting a cause of action with the doctrine of *res judicata*. Citing *Mullen v. General Motors Corp.*, 640 S.W.2d 144 (Mo. App.1982) for the proposition that all claims arising from a single contract must be consolidated in a single action, Korte argues that OHP "split its cause of action" by assigning claims that had accrued as of July, 1993 while retaining claims that accrued thereafter. Not only does Korte confuse two separate legal doctrines, it misstates the holding of *Mullen*. In *Mullen*, the plaintiff bought a car from the defendant which turned out to have numerous mechanical defects. The plaintiff brought two separate suits: one sought to recover for the failure of the car's braking system while the other was based on

the auto's defective transmission. While the *Mullen* court held that the plaintiff had impermissibly split his cause of action because both claims arose out of the same "act, contract, or transaction," was integral to finding that both causes of action had accrued at the time the first suit was filed, so that both claims could have been consolidated in a single action. Obviously, a plaintiff is not barred from bringing a claim merely because he has previously brought a suit based on the same contract where the second action had not accrued at the time the first was prosecuted. *Nolan v. Kolar,* 629 S.W.2d 661, 664 (Mo.App.1982).

We hold that OHP's assignment of its contractual rights and its accrued causes of action arising from the contract was valid.

### Scope of Rights and Claims Assigned

■ Finally, we address the scope and nature of the rights and claims assigned to DMA by OHP. Korte contends that DMA had the burden in the trial court of proving exactly what rights and claims were purportedly assigned to it by OHP, and that DMA's failure to do so should bar it from compelling Korte to arbitrate. Korte does not cite any case which places such a burden on DMA, and one need but observe the procedural posture of this case to comprehend the error in Korte's position. DMA initiated this proceeding with a demand for arbitration, and Korte's only basis for resisting this demand was its assertion that it was not in privity of contract with DMA. Thus, the trial court only had jurisdiction to determine the validity of the assignment; Korte cannot use this issue as a means of bootstrapping the substantive claims into the trial court's jurisdiction, since a finding of the assignment's validity requires that the evidentiary proof of DMA's claims take place in arbitration. The substantive claims which DMA seeks to arbitrate with Korte merely need to have been alleged, and DMA's only burden of proof was a demonstration that the assignment was valid. *Sonnenfeld Millinery Co. v. Uhri,* 83 S.W.2d 168, 169 (Mo.App.1935)(describing a purported assignee's burden as one of proving that an assignment has occurred); *Britton v. Co-op Banking Group,* 4 F.3d 742, 746 (9th Cir.1993)(holding that a purported as-

signee must adduce evidence that an assignment was intended, and acknowledging that a contractual provision specifying such an intent qualifies.)

Thus, only legal issues are properly before this court. On September 14, 1990, OHP executed a release in favor of Korte which released Korte from any and all claims, whether known or unknown, which OHP had on the date of release arising out of the contract, except for "post-completion warranty obligations toward OHP arising from the construction contract." In light of this release, the trial court ruled that OHP had assigned to DMA all claims that accrued or might accrue after September 14, 1990, as well as any claims based on an express warranty in the contract, regardless of when such claim accrued. We agree with this reading of the effect of the 1990 release.

■ Korte attempts to winnow the scope of the claims that it will be compelled to arbitrate by urging that DMA must be barred from asserting claims of professional negligence and breach of implied warranty, because no such claims exist in this case and would not be assignable if they did exist. We will address these contentions in turn.

■ DMA alleged in its petition for arbitration that Korte was liable to it for professional negligence. Korte insists that the heightened standards imposed on professionals do not extend to construction contractors. Indeed, there are no cases in Missouri imposing professional standards of care on construction contractors, and DMA has abandoned its allegation of professional negligence on appeal, recasting its allegation in terms of ordinary negligence. We do not believe this revision salvages DMA's negligence claim, however. The conduct upon which DMA's assertion of negligence must rest is Korte's construction of the Project. While a mere breach of contract does not necessarily give rise to liability in tort, the acts or omissions which constitute the contractual breach might also breach the duty of reasonable care, thereby yielding tort liability. *Mac–Fab Products, Inc. v. BiState Devel. Agency,* 726 S.W.2d 815, 820 (Mo.App. E.D.1987). However, where the only dam-

age complained of is an economic loss resulting from defects in an item sold (or built) pursuant to contract, an action *ex contractu* affords the plaintiff complete relief, and a coterminous negligence action does not lie. *Sharp Bros. Contracting v. American Hoist & Derrick Co.*, 714 S.W.2d 919, 922 (Mo.App. W.D.1986); *Clayton Center Assoc. v. W.R. Grace & Co.*, 861 S.W.2d 686, 692–93 (Mo. App. E.D.1993). Such is the case here.

■■■ Korte also contends that DMA may not bring a claim for breach of implied warranty.[4]

■■■ Construction contracts have been imbued by law with an implied duty to perform in a workmanlike manner (sometimes described as an implied duty to perform in such a way as to produce a result which is fit for a particular purpose.) *Middleton v. Benne*, 849 S.W.2d 265, 267 (Mo.App. E.D.1993). However, where the contract contains an express provision governing the degree of skill and competence with which the work will be performed, the law need not and does not impose an implied warranty that would be wholly redundant. *Id. F & S Const. Co. v. Berube*, 322 F.2d 782, 785 (10th Cir.1963); *See* also *Hotchner v. Liebowits*, 341 S.W.2d 319, 326 (Mo.App.1960). Article 4.5.1 of the Contract in this case states that the work "will be of good quality." Thus, OHP possessed neither negligence nor breach of implied warranty claims and, therefore, its assignment to DMA could not have conveyed such claims.

This case is remanded for arbitration consistent with this opinion.

SIMON and HOFF, JJ., concur.

---

4. Although DMA originally advanced an implied warranty of habitability theory as well, it appears now to have abandoned this effort. The *Old Warson* implied warranty of habitability applies only to newly-constructed houses. *Logan v. Amberson*, 764 S.W.2d 116, 118 (Mo.App. W.D. 1988). The development in this case is more akin to an apartment complex than a house.